UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:15CV-28-JHM

FINANCE VENTURES, ET AL.                                    PLAINTIFFS

VS.

CHARLES "CHUCK" KING                                         DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on cross-motions by Plaintiffs, Finance Ventures, LLC ("Finance Ventures") and its founder, Rick Maike ("Maike"), and Defendant Charles "Chuck" King ("King"). Plaintiffs move for partial summary judgment on their defamation claim (Count I) [DN 13] and Defendant moves to dismiss Plaintiffs' Verified Complaint [DN 12]. Fully briefed, these matters are ripe for decision.

**I. BACKGROUND**

Finance Ventures is a multi-level marketing ("MLM") company formed in Wyoming as a Limited Liability Company with its principal place of business in Daviess County, Kentucky. The company also has several registered trade names in Wyoming, including "Global 1 Entertainment," or "G1E," and "Infinity 2 Global," or "I2G." Plaintiff Maike resides in Daviess County, Kentucky and is Finance Ventures's founder as well as a member of the company.

As an MLM, Finance Ventures utilizes distributors, referred to as "independent business owners" or "IBOs," to sell products and services to consumers. According to Finance Ventures, it maintains a network of approximately 18,000 IBOs worldwide who earn a commission based on their marketing of Finance Ventures's products and services. Defendant King became an IBO with Finance Ventures on January 7, 2014. [Answer, DN 7, at ¶ 4] (admitting that King "became

an IBO on or around January 7, 2014"). In doing so, King also signed Finance Ventures's standard IBO Agreement. Id.

### A. King's "Side Operation"

Beginning in April 2014, King, without the approval of Finance Ventures, launched a "side operation" in which he used direct mail solicitation to obtain leads from consumers who might be interested in Finance Ventures's products. [Compl., DN 1, at ¶ 16]. Then, King contacted other IBOs who were interested in using these leads and charged them to be part of this direct mailer group. Id. The direct mailer focused on promoting Songstagram, a music video application, and an online gaming application. Id. at ¶¶ 18, 20. The success of King's direct mailer is unclear but the ultimate outcome is. Id. at ¶ 22. Several of the individuals who joined King's mailer group sought refunds from him. Id. In turn, this seemed to have prompted King to create http://i2gfullrefund.com, an interactive website, and to upload numerous videos on YouTube. Id. at 24. The claims made by King on his website and in the videos form the basis of Plaintiffs' Verified Complaint [DN 1].

Defendant's website encourages current IBOs to join his group arbitration against Finance Ventures in order to obtain a refund from the company. [Ex. A1-webpage from http://i2gfullrefund.com, DN 13-2]. The website includes a section where interested IBOs can fill out a form with their mailing information and state why they want to arbitrate with Finance Ventures. Id. According to the website, interested IBOs are required to pay Defendant a nonrefundable fee, calculated based on the number of IBO positions they purchased,[1] in order to join the group arbitration. Id. Although the text of the website does not fully explain the extent of the refund being sought, King's YouTube videos indicate that he intends to recover for "(1)

---

[1] Although Venture Finances offers several different levels of participation in their program, Defendant's website focuses exclusively on IBOs with the status of "Emperor."[Ex. A1-webpage from http://i2gfullrefund.com, DN 13-2].

2

money IBOs paid to King for his direct mail solicitation side operation. . . (2) initial and monthly payments made to Finance Ventures . . ., and (3) additional amounts from Finance Ventures for commission from applications . . . ." [Mem. in Support of Pls.' Mot. for Partial Summ. J., DN 13-1, at 5].

### B. King's Alleged Defamation and Libel

In Count I of Plaintiffs' Verified Complaint, they allege that Defendant King, by way of a website, e-mails, and YouTube videos, has disseminated defamatory statements and libelous material about Finance Ventures and Maike. [Compl., DN 1, at ¶¶ 53-57]. Based on a review of all the material circulated by Defendant, Plaintiffs believe that King's alleged defamatory and libelous statements fall within one of five themes. Plaintiffs describe those themes as follows:

> (1) that the company's online gaming application is deceptive and had ceased to exist . . . ; (2) that Plaintiffs used the Songstagram application as a "bait-and-switch" and that Plaintiffs did not have the right to promote Songstagram; (3) that Finance Ventures fraudulently recreated the "Infinity 2 Global" trade name as "Global 1 Entertainment" in an effort to steal IBOs' funds and keep its products and services hidden; (4) that Finance Ventures does not provide any products or services, but rather is selling illegal investments; and (5) that Maike, and others affiliated with Finance Ventures, were personally responsible for the sudden shutdown of another MLM operation known as Bidxcel.

[Mem. in Support of Pls.' Mot. for Partial Summ. J., DN 13-1, at 11-12]. At various times in Defendant's YouTube videos, he has assured viewers that the statements he is making are true. See, e.g., [Ex. B, Video 36, at 2:15] ("Everything I said was 100% true. Everything I state on my videos is 100% fact. . . . I have the right to call you whatever I want to in my opinion. . . . This is my opinion, and my opinion only. And it will show up that I was 100% correct."). Accordingly, Plaintiffs move for partial summary judgment for alleged defamatory statements made by King.

### II. Motion to Dismiss [DN 12]

This Opinion involves three different matters raised by the parties' two cross motions. The first two issues are those raised solely by Defendant King. In his motion to dismiss, Defendant

asserts that Plaintiffs' Verified Complaint must be dismissed for lack of personal jurisdiction. Additionally, Defendant raises the question as to whether some or all of Plaintiffs' claims are barred by the arbitration section contained in the IBO Agreement. Lastly, both parties seek summary resolution as to Plaintiffs' defamation claim. Defendant moves to dismiss the claim while Plaintiffs believe that summary judgment should be granted in their favor.

### A. Personal Jurisdiction

The Court will first address the Defendant's motion that the complaint should be dismissed for lack of personal jurisdiction. The burden is on Plaintiffs to demonstrate that jurisdiction exists. See Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991). To make such a showing, "the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." Id. Further, when presented with a Rule 12(b)(2) motion, "the court has three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." Id. (citation omitted).

Plaintiffs have not sought an evidentiary hearing nor does the Court believe the facts require one. If the court determines the jurisdictional issue on written submissions only, the plaintiff "need only make a prima facie showing of jurisdiction." Compuserve, Inc. v. Patterson, 89 F.3d 1257, 1262 (6th Cir. 1996). When making such a determination without an evidentiary hearing, "the court must consider the pleadings and affidavits in a light most favorable to the plaintiff." Id. Furthermore, the court must "not consider facts proffered by the defendant that conflict with those offered by the plaintiff." Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir. 2002).

Subject matter jurisdiction in this case is based on diversity of citizenship pursuant 28 U.S.C. § 1332. In a diversity case, a federal court determines whether personal jurisdiction

exists over a nonresident defendant by applying the law of the state in which it sits. Third Nat'l Bank v. WEDGE Group Inc., 882 F.2d 1087, 1089 (6th Cir. 1989). The Court applies a two-step inquiry to determine whether it may exercise personal jurisdiction over a nonresident defendant: "(1) whether the law of the state in which the district court sits authorizes jurisdiction, and (2) whether the exercise of jurisdiction comports with the Due Process Clause." Brunner v. Hampson, 441 F.3d 457, 463 (6th Cir. 2006).

**1. Kentucky's Long-Arm Statute**

Looking first to Kentucky's long-arm statute, the Kentucky Supreme Court has found that the statute requires a two-prong showing before a court can exercise personal jurisdiction over a nonresident. Caesars Riverboat Casino, LLC v. Beach, 336 S.W.3d 51, 57 (Ky. 2011). First, the Court must find that a nonresident's conduct or activities fall within one of nine enumerated subsections in KRS 454.210. However, in this instance, Plaintiffs only rely on three of the nine subsections, KRS 454.210(2)(a)(1), (3), and (4).

> (2)(a) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's:
>
> 1. Transacting any business in this Commonwealth;
>
> . . .
>
> 3. Causing tortious injury by an act or omission in this Commonwealth;
>
> 4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth, provided that the tortious injury occurring in this Commonwealth arises out of the doing or soliciting of business or a persistent course of conduct or derivation of substantial revenue within the Commonwealth;

KRS 454.210.

If this first prong is satisfied, then the second prong requires the Court to determine if the Plaintiffs' claims arise from the Defendant's actions. See K.R.S. § 454.210(2)(b) ("When jurisdiction over a person is based solely upon this section, only a claim arising from acts enumerated in this section may be asserted against him."). Accordingly, "even when the defendant's conduct and activities fall within one of the enumerated categories, the plaintiff's claim still must 'arise' from that conduct or activity before long-arm jurisdiction exists." Caesars Riverboat, 336 S.W.3d at 56. This requires a showing of "a reasonable and direct nexus between the wrongful acts alleged in the complaint and the statutory predicate for long-arm jurisdiction[.]" Id. at 59. This analysis should be undertaken on a case by case basis, "giving the benefit of the doubt in favor of jurisdiction." Id.

The relevant portion of Plaintiffs' Verified Complaint concerning personal jurisdiction provides as follows:

> . . . . (c) King has targeted Kentucky and other residents who also have independent contractor agreements with Plaintiffs to download form letters from King's website www.i2gfullrefund.com that defame Plaintiffs, and instructed residents of Kentucky and other states to send the defamatory form letters to Kentucky's Attorney General, a copy of which is reproduced as **Exhibit 1** hereto; (d) despite the fact that he is not an attorney, King has targeted Kentucky and other residents who also have independent contractor agreements with Plaintiffs to pay money to him and the i2gfullrefund team to arbitrate alleged claims that the residents of Kentucky and other states may have against I2G / G1E, which claims are required to be arbitrated in Owensboro, Kentucky . . . ; (e) King has engaged in unlawful acts, including but not limited to creating and operating www.i2gfullrefund.com (registered through http://www.godaddy.com), uploading YouTube videos and, upon information and belief, engaging in telephone and other communications with Kentucky residents, causing tortious injury in Kentucky, including but not limited to adversely impacting Plaintiffs' reputation and legitimate business interests in the Commonwealth; (f) King has advertised, marketed, and solicited Kentucky residents with the same products and services described herein, and has placed those products and services in the stream of commerce in the Commonwealth of Kentucky . . . .

6

[Compl., DN 1, at ¶ 6]. Although Plaintiffs rely on three of the subsections in Kentucky's long-arm statute, the Court believes the most relevant and applicable section to this case is KRS 454.210(2)(a)(4).

The central theme of this litigation is Plaintiffs' allegations that Defendant, by print and video, has defamed them.[2] Thus, in breaking down the components of KRS 454.210(2)(a)(4), Plaintiffs must demonstrate that Defendant's actions caused tortious injury in Kentucky and that the alleged tortious injury "arises out of doing or soliciting of business or a persistent course of conduct or derivation of substantial revenue within the Commonwealth." KRS 454.210(2)(a)(4). At this point in the litigation, it is uncontested that Defendant created multiple YouTube videos and a website, www.i2gfullrefund.com, outside the Commonwealth. Further, Plaintiffs have alleged that Defendant's "actions have caused, and threaten to further cause, IBOs to breach their agreements with Finance Ventures" and "harm to the existing business and professional interests of Finance Ventures and Maike[.]" [Compl., DN 1, at ¶ 65-66]. Even without Plaintiffs' allegations, a review of the YouTube videos and the website leave little doubt that the purpose of the content is not only to solicit business for Defendant's refund enterprise but also to financially harm Plaintiffs. Considering that Finance Ventures's principal place of business is in Kentucky and Maike resides in Kentucky, Plaintiffs have sufficiently alleged that tortious injury occurred in this Commonwealth.

The more difficult question in assessing personal jurisdiction is whether Defendant's actions satisfy the prerequisite conduct (e.g. regularly doing or soliciting business, or engaging in a persistent course of conduct) contemplated in KRS 454.210(2)(a)(4). Defendant's website discusses his plan to find individuals to join his group arbitration and includes an interactive

---

[2] Although Plaintiffs' Verified Complaint consists of six counts, almost all of the remaining substantive claims flow from Defendant's alleged defamatory statements.

component to the website that enables viewers to submit their information in order to join the group. [Exhibit A2 - webpage from http://i2gfullrefund.com, DN 13-2, at 5-7]. While this conduct, standing alone, may not be enough to find that Defendant regularly does and solicits business within the Commonwealth, it may properly be considered in concluding whether the Defendant has engaged in a persistent course of conduct within the Commonwealth sufficient to satisfy the long-arm statute. The Court believes the Defendant clearly has engaged in a persistent course of conduct within the Commonwealth. In addition to soliciting other IBOs to join his group arbitration against Finance Ventures in order to obtain a refund from the company and providing a form to use, the Defendant includes pages that direct viewers to contact the Owensboro office of the FBI and Kentucky's Attorney General. [Exhibit A12 - webpage from http://i2gfullrefund.com, DN 13-3, at 2]; [Exhibit A4 - webpage from http://i2gfullrefund.com, DN 13-5, at 2]. The webpage also contains an interactive component where viewers can comment on the pages. In fact, it appears that King has communicated with commenters as an "admin" on these pages. [Exhibit A4 - webpage from http://i2gfullrefund.com, DN 13-5, at 2]. Combined, these activities indicate that Defendant has engaged in persistent conduct to satisfy Kentucky's long-arm statute.

     Finally, pursuant to Caesars Riverboat, a nexus must exist between Plaintiffs' claims for defamation and KRS 454.210(2)(a)(4). This is fairly straightforward in this case. Defendant's attempt to find individuals to join his group arbitration and his suggestion that individuals contact law enforcement in Kentucky is the very heart of Plaintiffs' defamation claims against him. It is clear Plaintiffs' claims arise out of the statutory predicate under Kentucky's long-arm statute.

**2. Due Process**

After finding that Kentucky authorizes jurisdiction, the Court must determine whether the exercise of personal jurisdiction conforms with due process. "The relevant inquiry is whether the facts of the case demonstrate that the nonresident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" Theunissen v. Matthews, 935 F.2d 1454, 1459 (6th Cir. 1991) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). The Sixth Circuit has identified three criteria for determining whether specific in personam jurisdiction[3] may be exercised.

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968).

The Sixth Circuit considers purposeful availment, the first prong under the Southern Machine test, one of the key components in finding personal jurisdiction. Intera Corp. v. Henderson, 428 F.3d 605, 616 (6th Cir. 2005) ("This Court views the purposeful availment prong of the Southern Machine test as 'essential' to a finding of personal jurisdiction." (citation omitted)). In cases involving websites and questions of personal jurisdiction, purposeful availment is assessed relative to the interactive nature of the website in question. See Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 890 (6th Cir. 2002). As explained by the Sixth

---

[3] The Court does not consider general personal jurisdiction a viable option in the present case considering that the contacts in Kentucky must be "so 'continuous and systematic' as to render [Defendants] essentially at home in the forum State." Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011) (quoting International Shoe, 326 U.S. at 317). This is clearly not supported by the facts in this case.

Circuit, "[a] defendant purposefully avails itself of the privilege of acting in a state through its website if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 890 (6th Cir. 2002) (Citing Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119, 1124 (W.D. Pa. 1997)). Although Plaintiffs have not produced direct evidence demonstrating that individuals from Kentucky have used Defendant's website to contact him or join his group arbitration, it is clear that Defendant seeks to have those on the website interact with Kentucky by having them contact Kentucky law enforcement. By itself, this does not seem to be enough. Particularly, the connection between those who use the interactive component of Defendant's website and Kentucky residents is tenuous. However, a lack of evidence as to the interactive component of the website is not dispositive here.

In Calder v. Jones, 465 U.S. 783 (1984), the Supreme Court explained that a writer and an editor for the *National Enquirer* magazine would be subject to personal jurisdiction because they intentionally directed their allegedly tortious article at a California resident. Calder v. Jones, 465 U.S. 783, 789-90 (1984). The Supreme Court found jurisdiction even though the article had both been written and edited in Florida and most of the research had been done over the telephone while defendants were in Florida. Id. at 784-85. This was due to the fact that "[t]he article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered." Id. at 788-89. However, the Sixth Circuit has "applied Calder narrowly by evaluating whether a defendant's contacts with the forum may be enhanced if the defendant expressly aimed its tortious conduct at the forum and plaintiff's forum state was the focus of the activities of the

10

defendant out of which the suit arises." Scotts Co. v. Aventis S.A., 145 Fed. Appx. 109, 114 n. 1 (6th Cir. 2005) (citations omitted).

In the present case, the Court finds ample evidence to suggest that the focal point of Defendant's alleged tortious statements are directed at Kentucky. Again, defendant specifically references Kentucky law enforcement on his website. Additionally, there is little doubt that both Defendants, especially Maike who resides in Kentucky, feel the effects of Defendant's statements in Kentucky. Further, by virtue of his former contractual relationship with Finance Ventures, Defendant is fully aware that the ultimate impact of his statements would be felt in Kentucky. Thus, the Court finds satisfaction of the first prong.

The second and third prongs under the Southern Machine test are less stringent. See Air Products and Controls, Inc. v. Safetech Intern., Inc., 503 F.3d 544, 553-55 (6th Cir. 2007). For the second prong, the Court must simply determine "whether the causes of action were 'made possible by' or 'lie in the wake of' the defendant's contacts, or whether the causes of action are 'related to' or 'connected with' the defendant's contacts with the forum state[.]" Id. at 553 (quoting Youn v. Track, Inc., 324 F.3d 409, 419 (6th Cir.2003)) (internal citations omitted). Here, the statements made about Plaintiffs on Defendant's website and YouTube videos are the foundation for Plaintiffs' claims of defamation. In other words, Defendant's contacts with Kentucky and the causes of action are inseparable.

Finally, "where, as here, the first two criterion are met, 'an inference of reasonableness arises' and 'only the unusual case will not meet this third criteria.'" Air Products, 503 F.3d at 554 (quoting Theunissen v. Matthews, 935 F.2d 1454, 1461 (6th Cir.1991)). Under the third prong, courts consider the following factors: "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in

11

securing the most efficient resolution of the policy." Id. at 554-55 (citation omitted). In this case, there has been no evidence of a burden on Defendant in being hailed into the forum state. To the contrary, Defendant clearly intends on pursuing arbitration against Plaintiffs in Kentucky. [Mem. in Support of Mot. to Dismiss, DN 12-1, at 20]. The remaining factors also balance in favor of jurisdiction. Considering that both Plaintiffs reside in Kentucky, it would seem as the Commonwealth has an interest in the litigation. Undoubtedly, Plaintiffs also have an interest in obtaining swift relief in the forum state. Therefore, the Court finds that the final prong is satisfied.

Based on the analysis of the facts and the relevant case law, the Court finds personal jurisdiction proper.

### B. Arbitration

The Defendant next contends that the arbitration clause bars the Plaintiffs' claims against him. Although Defendant does not provide a thorough analysis of the application of Plaintiffs' arbitration clause, it is necessary to address the issue.[4]

Before fully examining the nature and scope of the arbitration agreement in the present matter, it is prudent to first discuss Plaintiff Maike. Plaintiffs represent in their brief that Maike is not a signatory to the IBO Agreement between Defendant and Finance Ventures. As a result, Maike cannot be obligated under the IBO Agreement to arbitrate his claims. The Court agrees.

---

[4] The Court believes the following section of Defendant's Motion to Dismiss evidences his desire to rely on the arbitration section found in the IBO Agreement:
> [I]t seem plaintiffs want to have their cake and eat too by singling out the defendant and attacking him with this lawsuit, when in fact deflecting regulatory agencies and lawyers throughout this United States with their arbitration clause in plaintiffs (*sic*) Terms of Agreement to try and stop an onslaught of investigations throughout this United States against the plaintiffs company, see (Exhibit 2) #29 in plaintiffs complaint. . . . Plaintiffs are abusing their own Terms of Agreement by selecting who can, and cannot, live under their Terms of Agreement in which all IBOs and plaintiffs agreed. . . . The facts are clear by plaintiffs own "Terms of Agreement" that arbitration is the plaintiffs "only remedy for any and all disputes", and to ask this court's opinion, whether or not this lawsuit is . . ." inconsistent with Plaintiffs arbitration clause" is beyond abuse to this court . . . ."

[Mot. to Dismiss, DN 12-1, at 8].

Ping v. Beverly Enterprises, Inc., 376 S.W.3d 581, 595 (Ky. 2012) (noting that the general rule of contracts is that "only parties to a contract may enforce or be bound by it provisions"). Further, there is no indication in the contract that Plaintiff Maike would be considered a third-party beneficiary. Id. ("The exception [to the general rule] comes about when the contracting parties intend by their agreement to benefit some person or entity not otherwise a party.").[5] Therefore, Plaintiff Maike is not bound by the arbitration section of the IBO Agreement.[6]

Having determined that the IBO Agreement does not apply to Plaintiff Maike, the Court must determine the extent, if any, to which the arbitration agreement applies to Finance Ventures. This requires an examination of Finance Ventures's claims and the arbitration section of the IBO Agreement. In the present matter, Plaintiff Finance Ventures alleges six causes of action against Defendant: (1) defamation and libel; (2) tortious interference with existing business relations; (3) tortious interference with prospective business relations; (4) breach of contract; (5) injunctive relief; and (6) punitive damages. [Compl., DN 1, ¶¶ 53-91]. The relevant portion of the IBO Agreement provides as follows:

> I understand and agree that except as set forth in the [Finance Ventures] IBO Guide, all claims and disputes relating to this Agreement, the right and obligation of the parties or any other claims or causes of action relating to the performance of this Agreement shall be resolved solely and exclusively by arbitration in the City of Owensboro, State of Kentucky in accordance with the Federal Arbitration Act and the Commercial Rules of the American Arbitration Association. This Agreement is performable in Daviess County, Kentucky and governed by the laws of the State of Kentucky.

[Ex. D (1 of 2) – IBO Standard Agreement, DN 13-31, at ¶ 28]. The corresponding IBO Guide section referenced in the IBO Agreement states:

---

[5] Although the Court is aware of cases where non-signatories are deemed to be standing in the shoes of a signatory to an arbitration agreement, see Scott v. Louisville Bedding Co., 404 S.W.3d 870, 875 (Ky. App. 2013), Defendant has not advanced such an argument.

[6] Of course, because Maike is not a signatory to the IBO Agreement, the Court presumes that the breach of contract is solely brought by Finance Ventures.

> **8.3 Dispute Resolution.** In no event shall any [Finance Ventures] shareholder, officer, director, consultant or employee, be liable to any current, former or prospective IBO for any consequential, indirect, or special damages. Any claims or disputes concerning the IBO Application/Agreement, or An IBOs relationship with [Finance Ventures] that cannot be amicably resolved with or by [Finance Ventures] shall be resolved solely and exclusively by arbitration in the city of Owensboro, state of Kentucky in accordance with the Federal Arbitration Act and the commercial rules of the American Arbitration Association. This Agreement is performable in Daviess County, Kentucky and governed by the laws of the State of Kentucky, without regards for conflicts of laws principles.  Nothing in the Agreement or these Policies and Procedures shall prevent [Finance Ventures] from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction, permanent injunction or other relief available to safeguard and protect [Finance Ventures's] interest prior to, during or following the filing of any arbitration or other proceeding or pending rendition of a decision or award in connection with any arbitration or other proceedings.

[Ex. D (1 of 2) – IBO Standard Agreement, DN 13-32, at 15-16].

Generally, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" Linden v. Griffin, 436 S.W.3d 521, 525 (Ky. 2014) (citation omitted). Here, in considering the scope of the IBO Agreement, the Court notes that the language indicates a large range of claims that must be submitted to arbitration. See U.S. ex rel. Paige v. BAE Systems Technology Solutions & Services, Inc., 566 Fed. Appx. 500, 504 (6th Cir. 2014) ("The arbitration provision in the Employment Agreement is narrower than those in cases addressing broadly-worded arbitration clauses because it explicitly limits the scope of the clause to the disputes arising 'under the terms of this agreement' and does not include claims 'related' to the agreement or that arise out of the relationship between the parties.").  At the same time, the practical limitation on the broad language in the arbitration section turns on the standard set by the Sixth Circuit: "if an action can be maintained without reference to the contract or relationship at issue, the action is likely outside the scope of the arbitration agreement-along with the presumption in favor of arbitrability and the intent of the parties." NCR Corp. v. Korala

14

Associates, Ltd., 512 F.3d 807, 814 (6th Cir. 2008) (quoting Nestle Waters N. Am., Inc. v. Bollman, 505 F.3d 498, 505 (6th Cir. 2007)).

Despite the encompassing nature of the claims that must be submitted to arbitration, the Court finds that Finance Ventures's first three tort claims, and its request for injunctive relief, are not barred by the arbitration section. A review of Plaintiffs' Verified Complaint reveals that their defamation and tortious interference claims all fall within five subject areas: online gaming, Songstagram, Finance Ventures's new trade name, the selling of investments, and Bidxcel. Although all five of these topics involve Finance Ventures's business, they do not specifically relate to Defendant's IBO Application/Agreement, or his prior relationship with Finance Ventures. Cf. Kruse v. AFLAC Intern., Inc., 458 F. Supp. 2d 375, 386 (E.D. Ky. 2006) (finding plaintiff's state law claims arbitrable because they "relate[d] to the defendants not paying plaintiff for services preformed in the plaintiff's employment capacity"). The crux of the test articulated by the Sixth Circuit is making a determination as to whether Finance Ventures's claims could have brought absent Defendant's prior contractual relationship with the company. Counts I, II, III and V are not dependent on any contractual relationship with the company and thus, Finance Ventures is not precluded by the arbitration clause from pursuing these claims here.[7]

As an alternative argument, Finance Ventures advances a very broad interpretation of the type of actions Finance Ventures is permitted to pursue under the arbitration agreement. Having found that Counts I, II, III, and V are properly brought here despite the arbitration agreement, the Court only needs to address this argument as it relates to Count IV, the breach of contract claim. According to Finance Ventures, the final sentence of Section 8.3 Dispute Resolution allows the company the right to file suit in this Court, rather than seek arbitration, in any instance where it is

---

[7] Count VI is a claim for punitive damages and does not constitute a separate claim.

necessary to "'safeguard and protect' its reputation and business relationships." [Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss, DN 18, at 13] (quoting Ex. D (1 of 2) – IBO Standard Agreement, DN 13-32, at 15-16). This is a creative, but ultimately, an unpersuasive interpretation of the arbitration section as it relates to Count IV. To permit this reading of Section 8.3, the Court would be nullifying the second sentence, which requires "any claims or disputes concerning the IBO Application/Agreement" to be "solely and exclusively" resolved by arbitration. [Ex. D (1 of 2) – IBO Standard Agreement, DN 13-32, at 15-16]. Surely, Plaintiff Finance Ventures recognizes that its breach of contract falls squarely within the type of claim that is subject to its arbitration agreement. As a result, Finance Ventures is precluded from asserting Count IV in this Court and it is dismissed.

### III. Defamation and Libel Claims

Plaintiffs move for partial summary judgment on Count I, their defamation and libel claim. Simultaneously, Defendant seeks to dismiss Plaintiffs' claims for defamation. For the reasons that follow, the Court denies both parties' motions as to the defamation claims.

As to Defendant's contention that Plaintiffs' claims must be dismissed, he relies on the incorrect standard for dismissal. Instead of arguing about whether Plaintiffs have properly articulated a claim under Rule 12(b)(6), he attempts to dispute the veracity of Plaintiffs' allegations. The cornerstone of review for a Rule 12(b)(6) motion is that court "must construe the complaint in the light most favorable to plaintiffs," League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted), accepting all of the plaintiffs' allegations as true. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Defendant's attack on the truthfulness of Plaintiffs' allegations is incongruent with granting a motion to dismiss under Rule 12(b)(6). Therefore, his motion must be denied.

Next, Plaintiffs move for summary judgment on their defamation claims. Plaintiffs argue that the conduct of the Defendant constitutes defamation per se. They cite to <u>Stringer v. Wal-Mart Stores, Inc.</u>, 151 S.W.3d 781(Ky. 2004), for the proposition that Defendant has the burden of proving his defense of truth and that his evidence is insufficient to establish his defense. It is true that the Defendant will ultimately have the burden of proving his defense but the question for the Court is whether now is the appropriate time to require him to "put up or shut up" as suggested by the Plaintiffs.

At this juncture, the parties have engaged in only very limited discovery in this case.[8] Because the case is in its infancy, the record is not fully developed sufficiently for the Court to grant summary judgment for the Plaintiffs.

Federal Rule of Civil Procedure 56 provides a Defendant with a mechanism for responding to a motion for summary judgment when facts are not yet available to properly respond to the motion. Specifically, Rule 56(d) provides that if a nonmovant shows by affidavit or declaration that it cannot present facts to properly support its opposition to a motion for summary judgment, the Court may defer considering the motion, deny it, or allow time to obtain discovery, affidavits, or declarations. While the Defendant did not utilize Rule 56(d) specifically, it is axiomatic that federal courts often employ more lenient standards with a pro se party when it comes to more sophisticated matters of procedure. <u>See, e.g.</u>, <u>Jourdan v. Jabe</u>, 951 F.2d 108, 110 (6th Cir. 1991). Here, the better course of action is to allow this case to proceed such that the record may be more fully developed. Plaintiffs' present motion for partial summary judgment will be denied without prejudice and it can be refiled following the close of discovery.

---

[8] According to the Court's Scheduling Order [DN 15], the parties did not have to submit their initial disclosures required by Federal Rule of Civil Procedure 26(a)(1) until May 29, 2015, which was only a short time after responses for the cross motions were due.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss [DN 12] is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment [DN 13] is **DENIED**.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

September 18, 2015

cc: counsel of record
    Defendant, pro se